# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A15-0261

In re Minnwest Bank Litigation Concerning Real Property in Otsego, Minnesota,

Minnwest Bank,
Appellant,

vs.

RTB, LLC,
Respondent.

**Filed December 7, 2015**
**Affirmed in part, reversed in part, and remanded**
**Halbrooks, Judge**

Wright County District Court
File No. 86-CV-11-621

Scott M. Lucas, Shaun D. Redford, Olson & Lucas, P.A., Edina, Minnesota (for appellant)

Kay Nord Hunt, Michael R. Moline, Lommen Abdo, P.A., Minneapolis, Minnesota; and

Gerald S. Duffy, Monroe Moxness Berg, P.A., Minneapolis, Minnesota (for respondent)

Considered and decided by Hooten, Presiding Judge; Cleary, Chief Judge; and Halbrooks, Judge.

## S Y L L A B U S

1.     A landowner awarded damages for an encroachment on real property is entitled to both diminution-in-value damages reflecting the value of the land pre- and post-encroachment and conveyance damages if the landowner is ordered to convey fee title to the encroached-upon property.

2.     A district court should consider the size of the encroachment when balancing the equities and hardships to determine whether injunctive relief is warranted.

3.     A landowner is not entitled to both diminution-in-value damages and the lost rental value of the encroached-upon land for the period of encroachment.

**O P I N I O N**

**HALBROOKS**, Judge

Appellant Minnwest Bank challenges the damages award in favor of respondent RTB, LLC, arguing that the district court erred in (1) calculating diminution-in-value damages; (2) awarding ancillary damages for mortgage interest, property taxes, and maintenance expenses; and (3) determining the accrual date for prejudgment interest. Minnwest requests that we reverse the damages award and remand on the issue of prejudgment interest. By notice of related appeal, RTB seeks reversal of the district court's denial of injunctive relief or, in the alternative, an award of additional damages for the ordered conveyance of the encroached-upon strip of land.

We conclude that the district court properly awarded diminution-in-value damages to RTB for the encroachment of Building B on Outlot M. But because we conclude that the district court erred by denying RTB conveyance damages in addition to diminution-in-value damages when it ordered RTB to convey the encroached-upon land to Minnwest by quitclaim deed, we reverse and remand for the district court's determination of proper conveyance damages to be awarded to RTB. Because the award for lost rent constitutes a double recovery for RTB, we also reverse that award. Because these rulings will result in an increase to the damages award, the district court on remand will have an opportunity

2

to reconsider injunctive relief as an alternative remedy. Finally, because the district court did not err in awarding RTB prejudgment interest and the administrative cost to correct the record of the boundary-line location, we affirm the district court on those awards.

**FACTS**

Minnwest is a Minnesota state banking corporation that currently owns Building B, the encroaching structure. Building B is located on Outlot L, which is situated in a larger retail development area in Otsego. It is a two-story, 28,538 square-foot office building that encroaches by 18.3 feet onto Outlot M. RTB is a Minnesota limited-liability company formed for the purpose of purchasing Outlot M, which consists of 1.92 acres of vacant commercial land located in the southeast corner of Highway 101 and 90th Street Northeast in Otsego.

Outlots L and M were originally purchased together as part of a larger group of lots for the purpose of a large-scale commercial development. Robert Fields, the original developer, bought the land with his business partners William Christian and Todd Plaisted. The three were partners in a venture named Otsego Land Development Company. Fields envisioned a multi-building commercial development area that he called Otsego Waterfront East.

At some point after the initial purchase, Christian and Plaisted wanted out of the original deal because it was too big. In June 2003, Fields agreed to buy them out, and in exchange, Christian, Plaisted, and the other members of RTB agreed to purchase Outlot M for $13 per square foot. Christian and Plaisted, who are experienced in small-scale land development, intended to construct a free-standing retail liquor store on the lot.

3

RTB already owned a liquor store in Ramsey and discussed the Otsego location with its liquor franchisor.

In July 2003, Plaisted signed a letter of intent as the next step toward purchasing Outlot M. On August 18, 2003, Plaisted and Fields entered into a purchase agreement for Outlot M that reflected the purchase price of $13 per square foot. The plat for Outlot M was recorded on May 16, 2005, and RTB closed on the property on July 20, 2005. RTB obtained financing to complete the transaction and still owes on that loan today. RTB's ownership interest consists of 1.92 acres constituting Outlot M and an additional 5.98% fractional fee interest in another lot that serves as the development's storm-water-retention facility. RTB met with its liquor franchisor, applied for a liquor license, and began preparing for the development of Outlot M.

Around the time that RTB purchased Outlot M, Fields borrowed $7,250,000 from GCI Service Corporation to begin construction on the rest of the development. GCI was the original loan servicer on the loan. In August 2005, GCI sold an 86.21% participation interest to Minnwest but continued to service, manage, and oversee the loan. In fall 2005, Fields obtained a building permit and began construction of Building B on Outlot L. It is undisputed that Building B encroached on Outlot M by more than 18 feet when it was built. And it is also undisputed that RTB, Minnwest, and the City of Otsego were unaware of the encroachment during construction of Building B.

Christian learned in July 2007 that Building B likely encroached on Outlot M during a meeting with the Otsego city planner and other officials concerning an entirely unrelated RTB property. After the meeting, Christian inspected Outlots L and M and

4

commissioned a survey to determine the boundary line. The survey revealed that Building B encroached upon Outlot M by 18.3 feet and that Outlot L's large commercial garbage container, garbage shelter, and utility boxes had been built on Outlot M as well.

Fields encountered financial troubles in 2009 and defaulted on his loan with GCI. GCI discovered the encroachment when it was preparing for foreclosure proceedings. At the time that Building B was constructed, Minnwest was a loan participant with no responsibility for supervising construction. But during the foreclosure proceedings, Minnwest, as majority interest holder of the loan, elected to remove GCI as manager of the loan, took over as loan administrator, and has owned Outlot L and Building B in full since 2010. The parties stipulated that Minnwest is responsible for damages only for the period of time that it has owned the encroaching building.

In 2011, Minnwest commenced separate actions in Wright County and Hennepin County against RTB, GCI, and the title insurance company to determine if RTB consented to the encroachment through inaction or was otherwise estopped from asserting its rights or, in the alternative, to determine damages owed to RTB for the encroachment. The actions were consolidated, and GCI and the title insurance company were eventually dismissed as parties. Minnwest and RTB subsequently agreed in a joint statement of the case that Fields's encroachment constitutes a trespass.

With consent of the parties, the district court held an advisory jury trial on the issue of damages. By accepting the district court's "proposal for an advisory jury for . . . trial, the parties in this case waived any right to have the [c]ourt bound by any of the jury's findings." The district court ultimately found that "[t]he encroached-upon strip of

5

land extends the width of Outlot L and M . . . and encompasses the Building B encroachment plus a sidewalk, trash enclosure, and utility boxes, and a 10-foot setback, for a total of 5,985 square feet." This is approximately 7% of Outlot M.

RTB has, at all times, argued for the removal of the encroaching portion of Building B. The district court considered granting an easement as a possible remedy, but found that (1) no testimony or evidence presented at trial supported a finding that an easement had ever existed allowing the encroachment and (2) the parties agreed that, if the removal option was rejected, conveyance would be preferable to the grant of an easement from RTB to Minnwest. The district court entered judgment for RTB, awarding $638,434 in diminution-in-value damages; ordered RTB to give Minnwest a quitclaim deed for the encroached-upon portion of the property; $19,955.62 in lost rent; $19,905.51 in mortgage interest, property taxes, and maintenance expenses; and prejudgment interest. The district court also ordered Minnwest to pay the administrative costs to correct the boundary-line record, which were estimated to be $12,000. Minnwest appeals the diminution-in-value damages verdict; the mortgage interest, property taxes, and maintenance expenses; and the date of accrual for prejudgment interest. By notice of related appeal, RTB argues that the district court erred by denying its requests for conveyance damages and for injunctive relief.

## ISSUES

I. Did the district court err by denying RTB conveyance damages for the encroached-upon land it was ordered to convey to Minnwest?

II. Did the district court err by awarding diminution-in-value damages to RTB in the amount of $638,434?

III.    Did the district court err by denying RTB injunctive relief requiring removal of Building B from Outlot M?

IV.     Did the district court err by awarding damages to RTB in the amounts of $19,905.51 for mortgage interest, property taxes, and maintenance expenses and $19,955.62 for lost rent?

V.      Did the district court err by determining that RTB is entitled to prejudgment interest under Minn. Stat. § 549.09, subd. 1(b) (2014), beginning on September 20, 2010?

VI.     Did the district court err by ordering Minnwest to pay $12,000 in administrative costs to correct the property line?

**ANALYSIS**

**I.**

RTB argues that the district court erred by refusing to adopt the advisory jury's finding that RTB is entitled to $100,563.75 in conveyance damages separate and distinct from the diminution-in-value damages award of $638,434.  We review a district court's decision to award or not award damages for an abuse of discretion.  *Gabler v. Fedoruk*, 756 N.W.2d 725, 734 (Minn. App. 2008) (holding that it was necessary for this court to reach method-of-valuation arguments because the district court abused its discretion by incorrectly awarding damages); *see also Wenigar v. Johnson*, 712 N.W.2d 190, 209 (Minn. App. 2006) (noting that whether a district court's award of damages is proper is reviewed under an abuse-of-discretion standard); *Robert W. Carlstrom Co. v. German Evangelical Lutheran St. Paul's Congregation of the Unaltered Augsburg Confession at Jordan*, 662 N.W.2d 168, 173 (Minn. App. 2003) (holding that the record supported the district court's award of damages).

7

The district court concluded that an award of conveyance damages to RTB would result in a double recovery:

> As set out in this Court's August 7, 2013 order, and based on the agreed-upon final jury instructions, the proper measure of damages in this case is: the difference in value of the Outlot M before the encroachment and the value of Outlot M after the encroachment. . . . This amount does not include an award of $100,563.75, as calculated by the jury for the value of the land conveyed, because to so include it would be a double recovery and a windfall to RTB.

We note at the outset that the caselaw on this subject is fairly dated and distinguishable. The district court relied on the 1890 case of *Ziebarth v. Nye*, which addressed trespass damages for the plaintiff after his land was excavated for the purpose of building a public road. 42 Minn. 541, 44 N.W. 1027 (1890). The defendants in *Ziebarth* committed a trespass by "excavating, for the length of half a mile across plaintiff's farm, two parallel ditches, 30 feet apart, and throwing the earth between the ditches, thus forming an embankment." *Id.* at 542, 44 N.W. at 1027-28. The supreme court held that the aggrieved plaintiff was entitled to "recover compensation for all damages to the property resulting from the trespass, whether present or prospective." *Id.* at 544, 44 N.W. at 1028.

Although the actions complained of in *Ziebarth* are of a different nature than what we are presented with today, the underlying grievance is the same. In both cases, the property owner's land is affected by a trespass. The defendants in *Ziebarth* claimed that because the plaintiff's land had been excavated for the purpose of building a public road, the plaintiff should be forced to dedicate the land to public use. *Id.* The supreme court declined to adopt this argument and instead concluded that the plaintiff was owed

8

damages for the difference in the value of the farm with and without the excavation ditches. *Id.* at 544-47, 44 N.W. at 1028-29. But the supreme court also stated that the landowner retained title, noting that "nothing is clearer than that neither the title nor right to the permanent use of the property would pass to the public by the recovery of damages in this case." *Id.* at 546, 44 N.W. at 1029. Here, the district court ordered RTB to convey title to Minnwest of "that portion of Outlot M parallel to a line extending ten feet from the farthest encroachment onto Outlot M."

Minnwest contends that RTB's request for conveyance damages is directly contrary to not only *Ziebarth* but to two other encroachment cases decided after *Ziebarth—Wojahn v. Johnson*, 297 N.W.2d 298 (Minn. 1980), and *Olson v. Lindberg*, 286 N.W.2d 692 (Minn. 1979). *Wojahn* addressed a boundary dispute involving a shared driveway. The supreme court concluded that the appropriate remedy was to grant an easement in exchange for diminution-in-value damages.[1] 297 N.W.2d at 308. In *Olson*, a property owner innocently encroached upon an adjoining neighbor's land by approximately four feet while building a new home, and the supreme court held that the district court appropriately required the encroached-upon property owners to convey fee title to land in exchange for damages of $1,000 for the reasonable value of the land and $1,500 for expert witness fees. 286 N.W.2d at 692-93. The supreme court did not label these damages as conveyance damages, but the encroached-upon party was forced to

---

[1] *Wojahn* did not use the term "diminution-in-value," but stated, "If damages are sought, the measure of such damages should be the difference in value of the defendants' property with or without such future use." 297 N.W.2d at 308.

convey fee title to their property in exchange for the reasonable value of that conveyance. *Id.*

Here, the district court ruled that RTB must convey a quitclaim deed to Minnwest. This forced conveyance creates a damages consideration that is separate and distinct from the diminution-in-value award. Whereas the diminution-in-value award addresses the difference in the value of Outlot M before and after the encroachment, a conveyance award compensates for the value of the fee title that it is losing to Minnwest through the conveyance. Diminution-in-value damages are the standard measure of damages and are sometimes awarded in conjunction with an easement. *See, e.g.*, *Wojahn*, 297 N.W.2d at 307-08. In those cases, diminution-in-value damages are sufficient. But in some encroachment cases, such as the one before us today, the remedy includes divesting the owner of fee title to its property through no fault of its own. When a landowner is forced to permanently give up fee title to his land, the landowner is due compensation for that loss. And the proper calculation for that conveyance is one based on the estimated cost of the square footage of the land that the encroaching party would have otherwise paid for. This derives from the value of the fee title of the land acquired, which is not the same as the value of an easement granted to an encroaching party.

RTB's expert presented evidence at trial that the fair-market value of the conveyed strip of land was $100,563.75. That amount was adopted by the advisory jury as the amount that would fairly compensate RTB for the conveyance.[2] Because we conclude

---

[2] Neither the district court nor the parties maintain that the $100,563.75 valuation placed on the conveyance was arrived at incorrectly.

that the district court erred by denying conveyance damages to RTB, we reverse on this issue and remand to the district court with instructions to determine and award RTB separate and distinct conveyance damages as remuneration for the forced sale of the property to Minnwest. On remand, the district court can exercise its discretion to adopt the advisory jury's finding as to the damages or redetermine the appropriate amount.

**II.**

Minnwest challenges the amount of the district court's award of diminution-in-value damages to RTB for Building B's encroachment onto Outlot M. While the district court's decision to award or not award damages is reviewed for an abuse of discretion, *Gabler*, 756 N.W.2d at 734, the factual finding underlying "the amount and extent of damages is a question of fact." *Snyder v. City of Minneapolis*, 441 N.W.2d 781, 789 (Minn. 1989). "Generally, we will not disturb a damage award unless the 'failure to do so would be shocking or would result in plain injustice.'" *Dunn v. Nat'l Beverage Corp.*, 745 N.W.2d 549, 555 (Minn. 2008) (quoting *Hughes v. Sinclair Mktg., Inc.*, 389 N.W.2d 194, 199 (Minn. 1986)). Before concluding that the district court's factual findings are clearly erroneous, we must be left with the definite and firm conviction that a mistake has been made. *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013).

Diminution in value is a valuation method to measure a reduction in market value. *Black's Law Dictionary* 524 (9th ed. 2009) (defining diminution-in-value method). Minnwest notes that diminution in value is "calculated as the difference in the pre-encroachment value and the post-encroachment value of the property." And both parties agree that this is the proper method for calculating diminution in value. The district court

11

utilized this approach and concluded that "the proper measure of damages in this case is: the difference in value of the Outlot M before the encroachment and the value of Outlot M after the encroachment."

It is the district court's determination of pre-encroachment valuation that Minnwest challenges.[3] Minnwest contends that the pre-encroachment value is $1,003,620. RTB argues that the pre-encroachment value is $1,612,044—the price it paid for the property.

Both parties' experts opined that the best measure of market value is "the actual purchase price paid by a willing buyer and accepted by a willing seller." Minnwest's expert testified that evidence of a sale before encroachment would be "a very good indication of the before position." RTB's expert testified that "[t]he only way that you truly know what a property is worth is when a transaction occurs . . . ." The district court adopted this method of determining fair-market value and found that RTB's purchase price of $1,612,044 is the correct measure of pre-encroachment valuation. RTB purchased Outlot M in July 2005, and construction began on Building B in October 2005. The district court found that RTB's purchase date, just months before construction on Building B, was "near enough [to] the valuation date [of the encroachment] to supply reliable evidence of the 'before' market valuation."

---

[3] The parties' experts followed the same protocol to determine the post-encroachment valuation. Minnwest's expert testified that the post-encroachment valuation is $977,220; RTB's expert determined the number to be $970,000. While the advisory jury returned a verdict that the market value of Outlot M immediately after the encroachment was $1,325,980.25, the district court declined to adopt the jury's finding and instead credited both parties' experts. The parties stipulated to an averaged figure of $973,610 for the post-encroachment valuation.

12

Minnwest seeks to have this court overturn the district court's findings on the valuation, claiming that the district court clearly erred when it assigned the $1.6 million purchase price as the pre-encroachment valuation because that price also included RTB's interest in Outlot A.[4]  But "[a]ssigning a specific value to an asset is a finding of fact; disputes as to asset valuation are to be addressed to the trier of fact, and conflicts are to be resolved in that court."  *Hertz v. Hertz*, 304 Minn. 144, 145, 229 N.W.2d 42, 44 (1975).

Because Building B only encroaches on Outlot M and not Outlot A, Minnwest argues that the $1.6 million valuation is excessive and that Outlot A's square footage should be parsed out of that final number.  Outlot M is 1.92 acres, and the fractional fee interest in Outlot A equates to 1.02 acres.  This equals a total of 2.94 acres, or 127,893 square feet.  It is true that the purchase price (and subsequent diminution-in-value award) was calculated at approximately $13 per foot for 127,893 square feet, but both experts noted either in anticipation of trial or at trial that these calculations can be fluid based upon the information to be reflected.

Minnwest's expert submitted a report addressing the before- and after-market-value appraisals.  He stated that "RTB, LLC purchased Outlot M from Otsego Waterfront East, LLC in July of 2005 for $1,612,044 or $19.27 per square foot."  RTB's expert testified that the $13 per square foot could easily be recalculated to show that RTB paid

---

[4] Outlot A is a facilities lot that provides all the lots in that development area with storm-water-management tools.  RTB purchased Outlot M with the intent to build a liquor store and a fractional fee interest in Outlot A was necessarily included by the city to support water-retention facilities for Outlots B through M.  The record reflects that RTB would not have purchased an interest in Outlot A had the city not mandated it.

13

$19 per square foot for usable space. He clarified that "[i]t's all a matter of the site area that you recognize. What we choose to do in appraisal work, and what I believe is proper, is that we recognize land that what we term is 'usable.'"

Although not explicitly argued, Minnwest urges this court to conduct a de novo review of the valuation, which would be appropriate if the district court had erred concerning the *method* of valuation. But there is no error in the district court's method, and, thus, this court is limited to a clear-error standard. The district court concluded that, based on the weight of the evidence, the advisory jury's valuation of $1,612,044 should be adopted as the appropriate fair-market value for the pre-encroachment valuation. This finding of fact is amply supported by the record and reflects a professional standard of practice in the field of appraisal. For these reasons, we conclude that the district court did not err by calculating the diminution-in-value damages to be $638,434—the difference between the pre-encroachment valuation of $1,612,044 and the stipulated post-encroachment valuation of $973,610.

**III.**

We now turn to whether the district court erred by denying RTB the injunctive relief it seeks. Generally a permanent injunction is the "'proper remedy to restrain a continuous and repeatedly threatened trespass.'" *Wojahn*, 297 N.W.2d at 307 (quoting *Theros v. Phillips*, 256 N.W.2d 852, 859 (Minn. 1977)). But an injunction is an equitable remedy and should not be issued lightly or where it would be "grossly inequitable to do so." *Id.*; *see also State v. Nicollet Cty. Bd. of Cty. Comm'rs*, 799 N.W.2d 619, 626 (Minn. App. 2011). Equitable determinations are reviewed for an abuse of discretion.

14

*City of N. Oaks v. Sarpal*, 797 N.W.2d 18, 23 (Minn. 2011). The district court may, in its sound discretion, grant or deny a permanent injunction. Its action will not be disturbed on appeal unless, based on the record as a whole, it appears that there has been an abuse of such discretion. *Bush Terrace Homeowners Ass'n v. Ridgeway*, 437 N.W.2d 765, 768 (Minn. App. 1989). An abuse of discretion occurs when the district court's decision is not supported by the evidence. *Minneapolis Cmty. Dev. Agency v. Itasca Co.*, 403 N.W.2d 310, 313 (Minn. App. 1987). This court may also overrule the district court if the court's ruling is "based on an erroneous view of the law." *City of N. Oaks*, 797 N.W.2d at 24.

"The dominant approach in the encroachment cases is to balance the relative hardships and equities and to grant or deny the injunction as the balance may seem to indicate." 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 5.10(4), at 816 (2d ed. 1993). Courts should be guided by two main principles. First, "no one should be permitted to take land of another merely because he is willing to pay a market price for it. This would amount to a private eminent domain." *Id.* Second, extortion and economic waste that may arise from the destruction of the encroaching structure should be avoided, if possible. *Id.*

Relevant caselaw in this state is sparse, and we have found no case in which a Minnesota court has addressed a request for equitable relief for an encroachment of this magnitude. The district court used the three-pronged balancing approach that the supreme court set forth in *Wojahn*, which provides that "[t]he equity court may deny an injunction requiring the removal of the structure if the structure does not irreparably

15

injure the neighbor's property, was innocently made, and where the cost of removal would be great compared to the inconvenience caused the neighbor by the continuance of the encroachment." 297 N.W.2d at 307.

Christian testified at trial, and the district court found, that RTB has not been able to pursue development opportunities on Outlot M due to a cloud on the title created by the encroachment. Nor has it been able to sell the lot. It is undisputed that RTB cannot use the property as intended at the time of purchase as a direct result of the encroachment. Additionally, the district court found that Outlot M will be overburdened with parking for Building B because Outlot L's parking is insufficient for the size of the building. Minnwest claims that because Outlots L and M have a reciprocal parking agreement, Outlot M is required to accommodate any extra parking. But a reciprocal parking agreement does not anticipate or excuse an encroachment. Despite these concerns, the district court concluded that because RTB has an adequate remedy at law through damages, RTB is not irreparably harmed.

Whether an encroachment is de minimis may affect either whether the property owner is irreparably harmed by its existence or whether the cost of removal would be too great compared to the inconvenience caused the neighbor by the continuance of the encroachment. *See, e.g.*, *Rose Nulman Park Found. ex rel. Nulman v. Four Twenty Corp.*, 93 A.3d 25, 30-31 (R.I. 2014) (holding that an encroachment of 6.6% was not de minimis and the district court "grappled with the relative hardships to the parties" before granting injunctive relief). For example, whether an encroachment is de minimis is reflected in the following:

16

> If the total cost of removal of the encroachment, including the loss in value of the defendant's remaining building, was very high in comparison to the harm done to the plaintiff because the building encroached on his property, that disparity in economic consequences would be a significant factor in determining whether to issue the injunction.

Dobbs, *supra* § 5.10(4), at 817. But "while the size of the encroachment provides an important factor when balancing the hardships, it does not comprise the entire inquiry." *AMKCO Co. v. Welborn*, 21 P.3d 24, 29 (N.M. 2001). Addressing the size of the encroachment in a balancing of equities and hardships is consistent with the *Wojahn* analysis, where the supreme court acknowledged that "[t]he most common situation in which a court has discretion to deny an injunction against future trespass is when a landowner has built a structure that slightly encroaches on his neighbor's property." 297 N.W.2d at 307.

Here, the district court invoked *Wojahn* as authority to deny RTB injunctive relief without weighing the size of the encroachment and its effect on RTB's property rights. The record indicates that the district court may have been disinclined from the outset to engage in an adequate balancing test, stating to counsel before the advisory jury trial began that there was "zero chance" that it would grant RTB injunctive relief. Because of this problematic exchange on the record, we question whether the district court truly considered injunctive relief as a remedy, despite citing *Wojahn* in its final order. But we are also mindful that our standard of review of this issue is abuse of discretion. Although we are troubled by the district court's explicit determinative statement at the beginning of trial, the district court ultimately engaged in a balancing test using evidence presented to

it during the advisory jury trial. The district court analyzed each of the three *Wojahn* prongs and found that the cost of at least $713,760 to remove the encroachment was greater than the $638,434 RTB is entitled to in diminution-in-value damages. The district court concluded that "[i]n light of the parties' comparable degree of fault . . . an injunction requiring removal of the encroaching portion of Building B would be grossly inequitable."[5]

While we do not conclude that the district court abused its discretion by denying injunctive relief to RTB, the district court has an opportunity to reengage in a balancing of equities and hardships in light of our holding that RTB is entitled to damages for the forced conveyance of property to Minnwest. On remand, the district court may either increase its damages award to include conveyance damages or grant injunctive relief, with the understanding that RTB is not entitled to both.

## IV.

Minnwest argues that the district court erred by awarding RTB $19,905.51 for mortgage interest, property taxes, and maintenance expenses. Minnwest also challenges the award of $19,955.62 for lost rental value in addition to diminution-in-value damages. We review a district court's decision to award damages for an abuse of discretion. *Gabler*, 756 N.W.2d at 734.

A district court may award additional damages in excess of a customary damages award to minimize a loss to innocent plaintiffs whose property has been encroached

---

[5] RTB presented evidence in the form of a contractor estimate that reflected a cost of at least $713,760 to remove the encroachment. The district court relied on this estimate when it determined that the *Wojahn* test favored Minnwest.

18

upon. *See Olson*, 286 N.W.2d at 693. The advisory jury heard testimony from Plaisted in regard to various out-of-pocket expenses that RTB incurred related to the encroached-upon land and found that RTB was due $19,905.51 for those expenses. The district court found Plaisted's testimony credible in regard to the amount, which included $5,506.12 for 7% of total property taxes paid from June 1, 2010, to trial and $14,399.39 for mortgage interest during the same time period. The 7% derives from the total square footage of the encroachment. Because we conclude that the district court did not err by awarding damages for mortgage interest, property taxes, and maintenance expenses, we affirm this award in the amount of $19,905.51.

But while we affirm the award for mortgage interest, property taxes, and maintenance expenses, we conclude that the district court erred by awarding damages for both diminution in value and lost rental. "It is well established that a proper measure of damages for continuing trespass to land is the reasonable rental value of that land during the period of trespass." *Kortsan v. Poor Richards, Inc.*, 290 Minn. 339, 341, 188 N.W.2d 415, 417 (1971). The proper damages award for a permanent trespass is one measured by diminution in market value. *See Worden v. Bielenberg*, 119 Minn. 330, 333, 138 N.W. 314, 315 (1912); *Ziebarth*, 42 Minn. at 547, 44 N.W. at 1029.

The district court awarded RTB the lost rental value of the encroachment in the amount of $19,955.62, finding that the advisory jury properly determined this to be the correct amount based on the size of the encroachment and the length of time that Minnwest owned the building. But the district court failed to include a finding on the

19

nature of the trespass. To decide whether the district court erred, we must first determine whether the trespass is temporary or permanent.

> A permanent injury to real property . . . is one of such a character and existing under such circumstances that it will be presumed to continue indefinitely. A temporary, or continuing injury is one that may be abated or discontinued at any time, either by the act of the wrongdoer, or by the injured party.

*Hebert v. City of Fifty Lakes*, 744 N.W.2d 226, 234 (Minn. 2008) (quotation omitted).

Building B's encroachment on Outlot M constitutes a permanent trespass because it is not a recurring intrusion that may freely be abated at any time. *Compare Worden*, 119 Minn. at 332, 138 N.W. at 315 ("The injury here complained of is the act of defendant in making the excavations in the street; not in acts committed from day to day in doing the work, but the wrong resulting from the completed act."), *and Ziebarth*, 42 Minn. at 544, 44 N.W. at 1027-28 ("The alleged trespass consisted of a single tortious act upon the land of the plaintiff . . . ."), *with Heath v. Minneapolis, St. P. & S.S.M.R. Co.*, 126 Minn. 470, 474-75, 148 N.W. 311, 312 (1914) (concluding that an invasion from an embankment that caused diverted surface water to wash large deposits of sand onto plaintiff's land resulted in a continuing trespass), *and Bowers v. Mississippi & Rum River Boom Co.*, 78 Minn. 398, 403, 81 N.W. 208, 209 (1899) (concluding that actions of defendant, causing water, logs, and ice to be driven upon the shore of plaintiff's land, were in nature of continuing trespass).

Thus, the proper damages award is measured according to a diminution-in-value calculation. To award damages for rental value and diminution in value constitutes a

double recovery. We therefore conclude that the district court erred by awarding damages for both diminution in value and lost rental value, and we reverse the award of $19,955.62 for lost rental value.

## V.

Minnwest argues that the district court erred by establishing September 20, 2010, as the date prejudgment interest began to accrue because it failed to take two settlement offers into consideration. This issue involves the interpretation and application of Minn. Stat. § 549.09, subd. 1(b), which presents a question of law that we review de novo. *See, e.g.*, *Hogenson v. Hogenson*, 852 N.W.2d 266, 272 (Minn. App. 2014); *A & L Potato Co. v. Aggregate Indus.*, 759 N.W.2d 57, 58 (Minn. App. 2009); *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 390-91 (Minn. App. 2004), *review denied* (Minn. Aug. 25, 2004).

Prejudgment interest begins to run when an action is brought or a written demand is made, whichever is first. Minn. Stat. § 549.09, subd. 1(b); *see also Metalmasters of Minneapolis, Inc. v. Liberty Mut. Ins. Co.*, 461 N.W.2d 496, 502 (Minn. App. 1990), *review denied* (Minn. Dec. 20, 1990). For the purpose of prejudgment interest, a settlement offer must remain open for 30 days. Minn. Stat. § 549.09, subd. 1(b); *see also A & L Potato Co.*, 759 N.W.2d at 60 (holding that a "valid settlement offer under section 549.09, subd. 1(b) . . . allows 30 days for the other party to accept an offer or make a counterclaim before the prejudgment-limiting provisions of the statute are triggered").

The district court originally awarded prejudgment interest to RTB beginning on June 1, 2010, the date the parties agree that Minnwest acquired possession of Building B. Minnwest argued in a posttrial motion that this date did not align with the statutory

requirements under Minn. Stat. § 549.09 (2014). The district court agreed, corrected the error in its amended findings, and determined the accrual date to be September 20, 2010:

> The Court awarded prejudgment interest from June 1, 2010, which is the date the parties agree Minnwest took possession of Building B. (Stipulation filed 3/23/13.) This was in error. Pursuant to M.S.A. § 549.09, prejudgment interest should be awarded from the date of commencement of the action. A civil action is commenced against each defendant when the summons is served upon the defendant. Minn. R. Civ. P. 3.01. RTB was served with the summons in this matter on September 20, 2010.

On appeal, Minnwest argues that one of two separate settlement offers should have been considered as the accrual date for prejudgment interest—one on August 9, 2010, and the other on March 29, 2013. But Minnwest concedes in its reply brief that the March 29, 2013 offer was a rule 68 settlement offer that is not within the purview of Minn. Stat. § 549.09 because it was automatically withdrawn when not accepted in ten days. *See A & L Potato Co.*, 759 N.W.2d at 60. For similar reasons, the August 9, 2010 offer is also disqualified. Although not a rule 68 offer, it was clearly a settlement offer that provided only nine days for a response. Therefore, it did not conform to the statutory requirements for prejudgment interest accrual under Minn. Stat. § 549.09, which unambiguously provides for a 30-day response time. Accordingly, the district court did not err by setting September 20, 2010 as the date for accrual of prejudgment interest.

**VI.**

Minnwest contends that the district court erred by ordering it to pay $12,000 in administrative expenses to correct the recording of the property line. "We review a district court's award of damages for an abuse of discretion." *Gabler*, 756 N.W.2d at

22

734.  An abuse of discretion occurs when the district court's decision is not supported by the evidence.  *See Minneapolis Cmty. Dev. Agency*, 403 N.W.2d at 313.

Christian testified that the estimate for the administrative costs of correcting the boundary line was $12,000.  The advisory jury found his testimony credible, and the district court adopted the jury's finding, noting that the parties agreed to this figure.  Minnwest spoke to the inclusion of this cost in its closing argument to the jury and included it in its proposed findings of fact and conclusions of law, stating that "RTB can also recover for such other damages as shown with reasonable certainty will result from administrative and permitting costs associated with moving the property line."  Minnwest offers no legal or factual support for its claim that the district court erred by awarding this amount.  We conclude that the district court did not err by awarding $12,000 for the administrative costs of correcting the property-line record.

## D E C I S I O N

We affirm the district court's decisions on (1) the amount of the diminution-in-value award, (2) prejudgment interest, and (3) the administrative cost to correct the boundary-line record.  But because we conclude that the district court erred by denying conveyance damages to RTB, we reverse in part and remand so that the district court may determine the proper amount of damages to be awarded for the property that RTB is ordered to convey to Minnwest.  Because the combination of awards for diminution in value and lost rental value constitute a double recovery for RTB, we reverse the award for lost rental value.  Finally, because the adjustments to the damages will affect the balancing of equities, we reverse the denial of injunctive relief and remand to give the

23

district court an opportunity to reconsider whether injunctive relief or an award of conveyance damages is appropriate.

**Affirmed in part, reversed in part, and remanded.**